1

2

3

4

5

F I L E D
Clerk
District Court

FEB 26 2024

for the Northern Mariana Islands
By_____
(Deputy Clerk)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

6

7

8   YOON SUK CHANG,

9                    Plaintiff,

10          v.

11  UNITED STATES OF AMERICA,

12                   Defendant.

13

Case No. 1:21-cv-00037

**DECISION AND ORDER
GRANTING DEFENDANT'S
MOTION TO DISMISS PURSUANT
TO FED. R. CIV. P. 12(b)(1)**

14   Before the Court is Defendant United States' (the "Government") Motion to Dismiss

15  Plaintiff Yoon Suk Chang's ("Chang") Complaint alleging one cause of action: negligence for

16  liability pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1),[1] and 2671,

17  *et seq.*, pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction

18  under the FTCA's discretionary function exception. ("Mot.," ECF No. 17.) Chang opposed the

19  Government's Motion (Opp'n, ECF No. 29), to which the Government replied (Reply, ECF No.

20  32). Having considered the parties' briefs, oral arguments (Mins., ECF No. 33), and controlling

21  authorities, the Court hereby GRANTS the Government's Motion and DISMISSES Chang's

22

23  Complaint for the following reasons.

24  **I.      FACTUAL AND PROCEDURAL BACKGROUND**

25       The American Memorial Park ("AMP") is a roughly 139-acre park on the island of Saipan,

26

27

28

---

[1] The Complaint erroneously cites to 28 U.S.C. § 1346(b)(i) as a predicate to the liability of the United States. (Compl. ¶ 7, ECF No. 1.)

1

Commonwealth of the Northern Mariana Islands ("CNMI"), managed by the U.S. National Park Service ("NPS"), which is an operating unit of the U.S. Department of Interior.[2] (Alberti Decl. ¶ 5; Togawa Decl. ¶ 4, ECF No. 17-4.) AMP is the sole National Park on Saipan, and it honors the American and Marianas people who gave their lives during the Marianas Campaign of World War II. (Alberti Decl. ¶ 6.) Key monumental areas in AMP include the Marianas Memorial, the Memorial Court of Honor and Flag Circle, the Saipan American Memorial, and the Carillon Bell Tower. (*Id.* ¶ 7.) Within the 139-acre park, there is also a visitor center, museum, white sand beaches, sporting areas, picnic sites, playgrounds, walkways, and a thirty-acre protected wetland and mangrove forest. (*Id.* ¶ 8.) Concrete walkways and driveways are included, along with many grassy areas with no barriers or warning signs. (*Id.* ¶¶ 9-10, 19.) AMP employees maintain the grassy areas, and any known defects are mitigated or repaired when discovered during routine maintenance. (*Id.* ¶ 9.)

In December 2019, Chang was playing with his two sons in the grassy area adjacent to the amphitheater of AMP. (Compl. ¶ 9.) Chang's youngest son began walking towards the parking lot. (*Id.* ¶ 10.) As such, Chang followed him to stop his son from reaching the parking lot. (*Id.*) As Chang approached his son, "[Chang's] foot went into a hole, which was about one foot deep." (*Id.* ¶ 11.) Chang fell violently to the ground, twisting his ankle. (*Id.* ¶ 12.)

Following the fall, Chang did not go to the hospital, but due to the pain, he eventually went to Brothers Oriental Medicine Clinic and then Pacific Medical Center for an evaluation. (*Id.* ¶¶ 14-15.) In January 2020, Chang visited the Commonwealth Health Center ("CHC") on numerous occasions for his persistent ankle pain. (*Id.* ¶ 15.) The orthopedic specialist at CHC recommended an MRI scan, but Saipan did not have MRI capability and due to COVID-19, Chang was unable

---

[2] "AMP is an affiliated area of the NPS designated by an act of Congress. The NMI leases the land to the United States pursuant to a 1977 lease agreement." (Alberti Decl. 2 n.1, ECF No. 17-1.)

to obtain a referral to the neighboring territory of Guam. (*Id.* ¶ 16.)

Chang decided to travel to Korea in the beginning of June 2020 for treatment for his ankle. (*Id.* ¶ 17.) Chang underwent surgery and spent three months in Korea in preparation and post-surgery recuperation. (*Id.* ¶ 18.) Due to his ankle injury, Chang was unable to perform his job, which involved construction, for three months and suffered financial loss. (*Id.* ¶ 19.)

There are no other reported trip and fall incidents in the grassy area where Chang alleges to have fallen based on the Superintendent's personal knowledge, in consultation with staff and in review of records. (Alberti Decl. ¶ 15; Togawa Decl. ¶ 8.) Although no hole was perceived in the area when inspected by the Park Superintendent the following day with Chang, the ground was not perfectly level, with imperfections that could have been caused by erosion or other natural interventions. (Alberti Decl. ¶ 10; Togawa Decl. ¶¶ 6-7.) The Superintendent took four photographs, which were submitted as a part of her declaration, of the general area Chang identified as to where the hole was located that showed some imperfections. (Ex. 1 to Alberti Decl., ECF No. 17-2.) Chang disputes the Superintendent's statement on this point. (Chang Decl. ¶ 11, ECF No. 30.) Chang claims he found the hole in which he fell and injured himself, showed it to the Superintendent, and also took a picture of him lightly stepping on top of the hole as he could not step all the way in the hole because he was injured. (*Id.*) Chang's photographs indicating where his foot fell in the hole were previously submitted to the NPS in March 2021, as part of his administrative claim. (Ex. 2 to Alberti Decl., ECF No. 17-3.) For purposes of this Motion, the Government accepts Chang's version of events but nevertheless contends that the Motion must still be granted. (Reply 2.)

In December 2021, Chang filed this civil action against the Government alleging a single cause of action for negligence under the FTCA after he suffered this serious injury to his ankle alleging multiple breaches of duties including the following:

(i)   Failing to discover or warn of the dangerous condition created by the hole that Plaintiff's foot was trapped in.

(ii)   Failing to monitor drivers of vehicles operating in the public recreational areas to [e]nsure that they did not cause dangerous holes.

(iii)   Failing to inspect and monitor the areas of the park used by the public for recreational purposes to [e]nsure that dangerous conditions were prevented.

(iv)   Failing to discover a dangerous one-foot hole in an area of the park used by the public for recreational purposes.

(v)   Failing to conduct periodic inspections.

(Compl. ¶ 26.)

The Government seeks dismissal of this FTCA suit for lack of subject matter jurisdiction under the "discretionary function exception" at 28 U.S.C. § 2680(a). In particular, the Government contends that the actions taken by AMP employees to maintain the grassy area near the parking lot of AMP where Chang injured his foot are within the discretionary function exception. (Mot. 5.) Therefore, the Government is not liable under the FTCA because the decisions and policy tradeoffs that go into allowing public access to the grassy areas in the National Park, and/or the absence of warning signs, possible access to vehicles, undiscovered holes or ground irregularities made by visitors, maintenance crews, animals or erosion, are subject to the discretionary decisions of AMP's Superintendent and other federal employees. (*Id.*) This Court agrees.

## II.   LEGAL STANDARD

A party may move to dismiss a case for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Because of this, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id*.

Challenges to jurisdiction under Rule 12(b)(1) may be either facial or factual in nature. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack to jurisdiction "accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face

to invoke federal jurisdiction.'" *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014) (quoting *Meyer*, 373 F.3d at 1039). On the other hand, a factual attack "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id*. In a factual challenge, the court "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

Importantly, courts may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Meyer*, 373 F.3d at 1039 (citations omitted). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction. *Id*. Here, the Government's motion is supported by the declaration of AMP Superintendent Barbara Alberti (ECF No. 17-1), including photos taken by Alberti the day after Chang's fall on the grassy lawn (ECF No. 17-2), Chang's own statement in support of his administrative claim (ECF No. 17-3) together with photos he took at the place of his fall (ECF No. 17-3 at 5-9), and the declaration of Abram Togawa, the grounds maintenance laborer for AMP during the date of incident (ECF No. 17-4). Chang responded to the motion with his own declaration, as well as the declaration of Rita M. Celis (ECF No. 31) and the photos she took in June and July of 2022 of vehicles that were driven and parked on the grassy area where Chang was injured (ECF Nos. 31-1–31-3).

The Government replied to Chang's response with a second declaration by Superintendent Alberti describing the contents of the photos taken by Celis and the summer camp event for the two periods. (Second Alberti Decl., ECF No. 32-1.) Based on these filings, the Court finds the Government attacks the Complaint's subject matter jurisdiction allegations both facially and

factually. For purposes of this motion, the factual allegations in the Complaint that bear on jurisdiction are not presumed to be true. *Meyer*, 373 F.3d at 1039 ("The court need not presume the truthfulness of the plaintiff's allegations." (quoting *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)).

## III.    DISCUSSION

### A.    Federal Tort Claims Act

A party may bring an action against the United States only where the federal government waives its sovereign immunity. *Blackburn v. United States*, 100 F.3d 1426, 1429 (9th Cir. 1996). "If sovereign immunity has not been waived, the court must dismiss the case for lack of subject matter jurisdiction." *Esquivel v. United States*, 21 F.4th 565, 572-73 (9th Cir. 2021) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). The FTCA, 28 U.S.C. § 1346(b), generally authorizes suits against the United States for damages through the waiver of sovereign immunity. *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 535 (1988). Specifically, the FTCA authorizes suits against the United States for money damages

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

However, the Supreme Court has long recognized Congress's carveout exceptions from the FTCA's broad waiver of immunity, including the "discretionary function exception" contained in 28 U.S.C. § 2680(a):

> The provisions of . . . section 1346(b) . . . shall not apply to . . . [a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*See United States v. Varig Airlines*, 467 U.S. 797, 808 (1988). The Supreme Court created a two-step test for courts to determine whether the discretionary function exception applies in a case. *See United States v. Gaubert*, 499 U.S. 315, 322-23 (1991); *Berkovitz v. United States*, 486 U.S. 531, 535-37 (1988). First, courts determine if the action the plaintiff challenges involves an element of "judgment or choice." *Gaubert*, 499 U.S. at 322 (citing *Berkovitz*, 486 U.S. at 536); *Esquivel*, 21 F.4th at 573. Second, courts determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. If the court finds that both prongs of the two-part test are satisfied, the court must dismiss the case for lack of subject matter jurisdiction. *Esquivel*, 21 F.4th at 574 (quoting *Green v. United States*, 630 F.3d 1245, 1249-50 (9th Cir. 2011)). Ultimately, "[t]he United States bears the burden of proving the applicability of the discretionary function exception." *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008).

**B.     Step One: Element of Judgment or Choice**

The conduct Chang challenges pertains to the NPS employees' maintenance of the grassy area adjacent to the AMP amphitheater and near the parking lot. To determine if this conduct falls within the discretionary function exception, the Court considers whether the challenged conduct or omission involves an element of judgment or choice. "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Gaubert,* 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536).

Here, the United States contends the discretionary nature of the actions at issue are the NPS employees exercising their delegated discretion in weighing safety, costs, aesthetics, preservation of nature and other policy considerations necessary to manage the grassy area of the park and to make those areas available to the public. (Mot. 9.) The exercise of this discretionary decision to

manage this particular grassy area of the park, resulting in the lack of perfection in the ground such that Chang fell in that grassy area, were susceptible to policy considerations and therefore were discretionary. (*Id*.)

The NPS has managed AMP since 1978. In 1978, Congress specifically "authorized and directed" the Secretary of Interior, acting through the Director of the NPS "to develop, maintain, and administer the existing American Memorial Park." Pub. L. No. 95-348, § 5(a), 92 Stat. 487, 991 (1978). AMP is managed consistent with the NPS Organic Act, which directs the NPS to "conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." (Alberti Decl. ¶ 16 (quoting 54 U.S.C. § 100101)). In furtherance of the Organic Act, the NPS has established a three-tiered policy system. (*Id*. ¶ 17.) Level 1 pertains to the NPS Management Policies most recently updated in 2006 that provides the service-wide foundational policies for the management of NPS park lands and resources. *See* NAT'L PARK SERV., NPS MANAGEMENT POLICIES 2006 at https://www.nps.gov/subjects/policy/upload/MP_2006.pdf ("Management Policies"). Level 2 policy materials are the NPS "Director's Orders" which (1) supplement new or revised interim policies between the publications of new Management Policies; (2) provide detailed interpretation of Management Polices; (3) outline requirements applicable to NPS functions, programs, and activities; and (4) the means through which the Director delegates specific authorities and responsibilities, primarily to the Park Superintendents. (Alberti Decl. ¶ 17.) Level 3 materials include handbooks, reference manuals, and other documents containing comprehensive information in support of field and programmatic operations. (*Id.*) The relevant policy statements here are found in Level 1 and 2 materials.

In this case, Chang concedes that, "at least at this early stage in the litigation, the

Government meets the first part of the relevant test" regarding the element of judgment or choice. (Opp'n 11.) Further, Chang is unable to indicate—nor does this Court find—any federal statute, regulation, or policy that specifically prescribes a course of action for maintaining, monitoring, repairing, or inspecting the grassy areas of AMP.

Despite Chang's concession regarding the first step of the analysis, he does point to excerpts from Director's Order No. 50C and Management Policies on safety and injuries. (*Id.* ("The Directors Order #50C, entitled Public Risk Management, states that '[i]t is the intent of the National Park Service that all visitors have an injury-free park experience.'").) However, the Director's Order No. 50C and Management Policies that Chang highlights do not specifically prescribe a course of action for an employee to follow for the maintenance of the grassy area—the actions and omissions Chang alleges in his Complaint against the NPS.

More importantly, the Director's Order No. 50C states, "*public safety concerns are to be addressed . . . under the discretion of the park's superintendent. . . . Superintendents must make discretionary decisions that **balance public recreation and safety** with preservation of the protected natural, historic, or cultural setting*." U.S. DEP'T OF INTERIOR, NAT'L PARK SERV., DIRECTOR'S ORDER #50C, PUBLIC RISK MANAGEMENT PROGRAM 2 (2010) (emphasis added). The Management Policies that Chang also cites to similarly grants discretion to the superintendent and other park decision-makers: "*The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing*." NAT'L PARK SERV., MANAGEMENT POLICIES 2006, at 105. Therefore, not only is there no federal statute, regulation, or policy specifically prescribing a course of action for the NPS or respective employees to take with regards to the maintenance and monitoring of the grassy areas of AMP, but the existing policies and agency guidelines affirmatively confer discretion to the superintendent and other decision makers at the park the

means by which public safety concerns are to be addressed who must work within the limits of funding and staffing. When the relevant policies allow a government agent to exercise discretion as expressed or implied, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. "[I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id.* at 325. As such, the Court concludes that the Government satisfies step one of the discretionary function exception analysis by identifying the discretion conferred on the NPS Superintendent and park employees for public safety concerns at the park as it relates to the issue of managing the AMP grassy area that is used by the public for recreational purposes.

**C.      Step Two: Social, Economic, or Political Policy Considerations**

If the court finds that the challenged action involves an element of judgment, the court moves to the second step of its inquiry. The court therein determines "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. In particular, the court looks at whether the judgment is based on "social, economic, and public policy," and "when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'" *Gaubert*, 499 U.S. at 323 (citation omitted).

Under the second step, "the question of *how* the government is alleged to have been negligent is critical." *Whisnant v. United States*, 400 F.3d 1177, 1185 (9th Cir. 2005). Here, Chang alleges ways in which the Government breached its duty owed to Chang and was therefore negligent. In Chang's Complaint, he alleges the Government breached its duty by "[f]ailing to discover or warn of the dangerous condition created by the hole." (Compl. ¶ 26(i).) Chang also

alleges the Government breached its duty by failing to inspect or monitor the area of the park used by the public "to [e]nsure dangerous conditions were prevented." (*Id*. ¶ 26(iii).) Further, Chang alleges that the Government failed to "monitor drivers of vehicles to operating in the public recreational areas to [e]nsure that they did not cause dangerous holes." (*Id*. ¶ 26(ii).)

First, as a preliminary matter, the Court finds that nowhere in the Complaint does Chang allege facts that demonstrate that the Government actually knew of or was aware of the hole's existence. Despite this, in Chang's Opposition, he asserts that "[t]he complaint has alleged that Defendant knew or should have known about the hole in the ground." (Opp'n 11, 15-16.) This assertion is conclusory. The facts outlined by Chang in his Complaint and the affidavits he provides in support of his Opposition do not identify anyone or a government entity that knew of the hole hidden in the grass. (ECF Nos. 30-31.) On the other hand, to refute Chang's allegation of any knowledge by AMP employees, the Government submitted the declaration of Togawa, the grounds maintenance worker, who at the time of the incident worked at AMP for over five years. (Togawa Decl.) He is familiar with the 139-acre park and the location of where the injury occurred, is the worker who routinely maintained this area, and recognized that it is not perfectly level. (*Id*. ¶¶ 4, 7.) He states the grass is cut using lawn mowers with balloon tires in order to preserve the natural landscape. (*Id*. ¶ 6.) He did not discover any holes in the amphitheater area during his routine lawn maintenance before or after Chang's fall. (*Id*. ¶ 8.) Furthermore, even where Chang makes conclusory statements regarding the Government's alleged breaches of duty, the breaches do not implicate that the Government knew of the hole. Rather, Chang's alleged breaches concern failures to discover, warn, monitor, inspect, and repair. (Compl. ¶¶ 25-26.)

1.    *The Design-Implementation Distinction and Failure to Discover*

The Ninth Circuit has held in some instances, "the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that

course of action is not." *Gonzalez*, 814 F.3d at 1034 (citation omitted). Therefore, the Ninth Circuit has "required the government to face liability for 'a failure to effectuate policy choices already made.'" *Id.* at *1035* (*citing Camozzi v. Roland/Miller & Hope Consulting Grp.*, 866 F.2d 287, 290 (9th Cir. 1989)). However, the Ninth Circuit has "cautiously applied this doctrine and [has] applied it largely in cases involving public health and safety, and in circumstances where a private party would likely be held liable for the same conduct or omission." *Id.* (citations omitted).

Chang argues that the design-implementation distinction applies in this case because "AMP has specifically cleared the area where Plaintiff was injured and continually mows the grass in order for AMP visitors to use it." (Opp'n 13.) Chang contends that "AMP has chosen to frequently inspects [sic] the grassy area for defects and dangerous conditions, and to diligently maintain the grassy area as well as undertakes to mark and repair any hazardous conditions," (*id.*), but nowhere are these facts alleged in the Complaint. However, the declaration of Togawa as AMP's groundskeeper does support these contentions. (*See* ECF No. 17-4.) Nevertheless, although the Ninth Circuit caselaw Chang cites to does carveout a design-implementation distinction under the discretionary function exception, none of them are applicable to the case before the Court.

In *O'Toole v. United States*, the government was performing needed periodic maintenance work on an irrigation system. 295 F.3d 1029, 1032 (9th Cir. 2002). After the government ceased to perform the maintenance, the irrigation system fell into disrepair and caused property damage from runoff. *Id.* The plaintiffs claimed that they warned the government of the consequences of their failure to maintain the irrigation system. *Id.* Additionally, the government had numerous reports denoting the hazards. *Id.* In *O'Toole*, the Ninth Circuit found that the government's failure to repair the irrigation system for fiscal reasons was not the sort of public policy issue that the discretionary function exception was designed to protect. *Id.* at 1036. *O'Toole* is incongruous with the facts in this case. Unlike the government in *O'Toole* who had clear notice of its failure to

maintain, there is no allegation that shows the Government knew of the hole or knowingly failed to repair the hole that was a part of the maintained grassy areas of AMP. (*See* Compl.) Rather, Chang's alleged breaches of duty focus on the Government's failure to warn and discover the one-foot hole; the former assumes the Government had knowledge and the latter is a part of "'the *design* of a course of governmental action [that] is shielded by the discretionary function exception . . . .'" *Gonzalez*, 814 F.3d at 1034. Chang's allegation that NPS's failure to discover the hole constitutes a breach of duty focuses on the maintenance design because he cannot point to specific policies implemented that dictate how frequently park employees are required to survey the grassy area, how flawless they are to maintain the grassy area, or any policies of the like.

Terbrush v. United States*, 516 F.3d 1125 (9th Cir. 2008) also proves unhelpful to the facts of this case. In *Terbrush*, the Ninth Circuit focused on whether the government's failure to maintain the wastewater system was a breach of duty under the design-implementation distinction but ultimately concluded that it could not determine if the government met its burden from the record of the case because the parties, and the district court to some degree, lumped the question of maintenance together with other claims regarding design and construction. *Id*. at 1135.

As discussed above, under the second step, "the question of *how* the government is alleged to have been negligent is critical." *Whisnant*, 400 F.3d at 1185. Here, the Court finds that the design-implementation distinction is inapplicable to this case because Chang alleges in his Complaint breaches of duty that go to the design of a course of governmental action and not the implementation of that course of action. Chang does not factually allege in his Complaint that the Government has undertaken inspections of the grassy area of AMP. (*See* Compl.) Therefore, any allegation that the Government failed to inspect the grassy area, coupled with the fact that Chang

/ / /

/ /

cannot point to any specific park policy that requires inspection, supports a conclusion that Chang is specifically attacking the *design* of Government action and not the implementation of a Government policy, and thus the Government succeeds on its facial attack of the Complaint for subject matter jurisdiction. Moreover, in considering all of the filings and attached declarations for purposes of the Government's factual attack of subject matter jurisdiction, the Court finds that even though AMP employees do undertake inspection of the grassy AMP areas, how they choose to do so, how often, *and the standard to which they choose to keep the grassy areas* still does not fall under the design-implementation distinction because these decisions necessarily required decisions based on public policy concerns. Laborer Togawa outlined the process of how AMP employees address imperfections of the grassy area in his Declaration. (*See* Togawa Decl. ¶¶ 6-9.) Togawa states, the grass is cut using lawn mowers with balloon tires in order to preserve the natural landscape. (*Id*. ¶ 6.) "When imperfections are discovered, they are marked and filled with dirt, rocks or a combination of both. The imperfections can be caused by erosion, dead plants, rotting roots, crabs, dogs, other animals, people and other natural occurrences." (*Id*.) Togawa goes on to say he is familiar with the location where Chang fell and that, "[i]t is highly trafficked by people, and it is not perfectly level. The grass in the [a]mphitheater is a mixed grass and it is cut frequently as this is one of our most popular visitor use areas." (*Id*. ¶ 7.) He did not discover any holes in the amphitheater area during his routine lawn maintenance before or after Chang's fall. (*Id*. ¶ 8.) As such, AMP employees' decisions on how often to inspect the grassy areas, how and when to fill in any discovered holes, and most importantly *if holes warrant repair*, require AMP employees to weigh policy considerations of safety, public access, aesthetics, amongst others. Thus, the design-implementation distinction does not warrant the Government to face liability for its actions.

/ / /

/ /

1

2.      *Government's Factual Attack of Subject Matter Jurisdiction*

2

3        In addition, the Government succeeds on a factual attack of subject matter jurisdiction. As

4    indicated above, in a factual challenge, the court "is not restricted to the face of the pleadings, but

5    may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning

6    the existence of jurisdiction." *McCarthy*, 850 F.2d at 560.

7        Laborer Togawa outlined the procedure employees of AMP follow in identifying and

8    fillings holes. (Togawa Decl. ¶ 6.) Specifically, he stated "I am trained to look for imperfections

9    while maintaining Park grounds. When imperfections are discovered, they are marked and filled

10   in with dirt, rocks, or a combination of both." (*Id.*) He further indicated that he did not discover

11   any holes during his routine maintenance of the grassy area of AMP before or after Chang's fall.

12   (*Id.* ¶ 8.) Chang concedes in his Opposition that "AMP has chosen to frequently inspect[] the

13   grassy area for defects and dangerous conditions . . ." despite his claim that the Government has

14   failed to conduct periodic inspections, monitor the grassy area, and discover the hole. (Opp'n 13;

15   *See* Compl. ¶ 26(i, iii-v.) Therefore, in considering the parties' affidavits, briefs, and arguments in

16   a factual attack, it appears Chang's argument turns on the thoroughness as well as frequency of

17   the Government's inspection, the degree of pristineness that is expected of AMP grassy areas, as

18   well as how and when to abate or mitigate hazards such as the hole—rather than the Government's

19   failure to inspect.

20

21        In *C.H. v. United States*, the plaintiff alleged the government negligently failed to maintain

22   the park resulting in dangerous conditions, failed to comply with inspection requirements, and had

23   knowledge of standing dead trees within the park, resulting in a large tree falling onto a roadway

24   injuring the plaintiff. 528 F. Supp. 3d 1125, 1130 (E.D. Cal. 2021). In that case, the park *did*

25   undertake inspection of trees—even though there was no evidence of them inspecting the specific

26   tree that fell—and the government contended that whether the discretionary function exception

27

28

applied was contingent on how often trees should be surveyed, how surveys occur, and how to mitigate any hazards. *Id.* at 1135.

In the case before the Court, an AMP employee conducted inspections of the grassy areas in which Chang was injured. (Alberti Decl. 2.) The issue then turns on whether the failure to identify the hole is contingent on how often inspection and monitoring occurs and how AMP decides to mitigate hazards similar to that in *C.H.* In *C.H.*, the district court found that the government's decision regarding inspections and how to maintain the park was susceptible to policy analysis—economic considerations, employee safety concerns, cultural considerations, and environmental interests—and therefore met the second requirement of the discretionary function exception. 528 F. Supp. 3d at 1135. "The allocation of finite resources is a policy judgment the Ninth Circuit has long held to be protected under the discretionary-function exception." *Id.* (citing *Valadez v. United States*, 56 F.3d 117, 1180 (9th Cir. 1995)).

Similarly here, as to Chang's assertion of an alleged breach for failure to discover a dangerous one-foot hole in an area of the park used by the public for recreational purposes, (Compl. ¶ 26(iv)), the Court finds that the Government's discretionary judgment in how to maintain the grassy area is of the kind that the discretionary function exception was designed to shield. Congress charged the National Park Service with the duty to "promote and regulate the use of the National Park System" in order to "conserve the scenery, natural and historic objects, and wildlife" such that it will be "unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. The Management Policies thereafter gives discretion to Park Service employees such as those employed by AMP, to establish "park-specific visitor safety prescriptions." (Alberti Decl. ¶ 18 (citing NAT'L PARK SERV., MANAGEMENT POLICIES 2006, at 105).) Director's Order No. 50C further bolsters this discretion and clarifies that Park superintendents must "identify risks within their jurisdiction and [] mitigate these risks within the limits of available resources without

compromising the integrity of the environments they are charged to protect." (*Id.* (citing U.S. DEP'T OF INTERIOR, NAT'L PARK SERV., DIRECTOR'S ORDER #50C, PUBLIC RISK MANAGEMENT PROGRAM 2 (2010).) All the while, park superintendents

> must make discretionary decisions that balance public recreation and safety with preservation of the protected natural, historic, and cultural setting. While the NPS will strive to minimize the frequency and severity of visitor mishaps along with the associated pain, suffering, and financial expense, ultimately, visitors are responsible for their own safety.

U.S. DEP'T OF INTERIOR, NAT'L PARK SERV., DIRECTOR'S ORDER #50C, PUBLIC RISK MANAGEMENT PROGRAM 2 (2010). According to these policies, the Government is to weigh competing policy interests—such as balancing of free access, providing resources, fiscal restrictions, and aesthetic considerations—in deciding how to properly identify safety concerns and address those safety concerns, such as potential holes in the grassy area of AMP. Not only do these policies outline interests that the superintendent is to weigh, but Superintendent Alberti does in-fact discuss the weighing of such considerations when she provides an overview of AMP and its policies.

As described by Superintendent Alberti, AMP is a roughly 139-acre park on Saipan that was established by Congress in 1978 to honor the American and Marianas people who gave their lives during the Marianas Campaign of World War II. (Alberti Decl. ¶¶ 5-6.) The Park's components include the Marianas Memorial, the Memorial Court of Honor and Flag Circle, the Saipan American Memorial, and the Carillon Bell Tower. (*Id.* ¶ 7.) AMP is also a "'living memorial', which means that the grounds and facilities welcome visitors to gather and recreate at the Park's lawns, sports fields, walking paths, white-sand beaches, and visitor center, as well as to learn, remember, and reflect at the Park's museum and memorial sites." (*Id.* ¶ 8.) "The Park's grounds, sidewalks, and walkways, are subject to informal visual inspection by Park staff, including maintenance staff, as they conduct their duties at the Park." (*Id.* ¶ 9.) "The Park's grounds

and lawns are *not managed to a pristine standard*—they are subject to imperfections and undulations that would be typical of general-use grounds that are subject to various forms of recreation, maintenance vehicle use, erosion and weather impacts, and natural impacts from wildlife or subsurface animal activity." (*Id.* ¶ 10 (emphasis added).) "AMP is maintained daily except three major holidays – Thanksgiving Day, Christmas Day and New Year's Day. One to three laborers are on duty daily." (Togawa Decl. ¶ 5.)

Superintendent Alberti and Laborer Togawa's Declarations highlight the balancing that must go into permitting public recreation at AMP and safety considerations. There are only one to three laborers on duty daily at AMP who cover 139 acres. Despite this fact, AMP's employees still maintain and conduct visual inspections of the grassy areas. The degree to which the inspections and maintenance is performed is subject to balancing considerations such as financial restrictions in hiring additional employees, free access to the park, and preserving the natural and cultural setting. AMP's Superintendent could very well restrict access to visitors in order to conduct more frequent inspections of the grassy AMP areas. Additionally, AMP's Superintendent could ensure the grassy areas of AMP are to a pristine standard, inconsistent with the natural state from general use, erosion, and natural impacts from wildlife. However, in making decisions on what degree the grassy areas of AMP are kept in, the Superintendent must weigh the policy considerations outlined above.

Despite the Government's undertaking of inspections and cutting of AMP's grassy areas, this Court finds that Chang's negligent maintenance and inspection claim is barred by the discretionary function exception and must be dismissed for lack of subject matter jurisdiction just as the court in *C.H.* found that there was no subject matter jurisdiction despite the government's undertaking of inspections and mitigation of hazardous trees.

Unlike for unknown hazards, the Management Policies does provide more specific

guidance for known dangers in the park. For example, "[w]hen practicable and consistent with congressionally designated purposes and mandates, the Service will reduce or remove known hazards and apply other appropriate measures . . . . In doing so, the Service's preferred actions will be those that have the least impact on park resources and values." NAT'L PARK SERV., MANAGEMENT POLICIES 2006, at 105. However, even the policies for removing known hazards do not specify policies for the Government to abide by. Rather, Management Policies includes policy considerations such as the impact on the park resources and values.

3.      *Failure to Warn*

Chang also alleges a breach of AMP employees' duty to warn of the dangerous condition created by the hole. (Compl. ¶ 26(i).) "As an initial matter . . . there is a presumption that where the express or implied government policy 'allows a government agent to exercise discretion, it must be *presumed*, that the agent's acts are grounded in policy when exercising that discretion.'" *Lam v. United States*, 979 F.3d 665, 681 (9th Cir. 2020) (citations omitted). In *Lam*, a tree collapsed on the plaintiff's tent and smashed his foot. *Id.* at 670. When the Ninth Circuit analyzed the applicable park policies in *Lam* under the second prong of the discretionary function exception test, it determined that the government's decision to cut down a tree is "susceptible to competing policy considerations." *Id.* at 681.

In this case, Management Policies specifies policy considerations for the Government to weigh and consider when making decisions about AMP that are similar to those listed in *Lam*. In *Lam*, the applicable guidelines required decisionmakers to balance policy considerations such as preservation, protection of resources, enhancement of aesthetic integrity, safe and healthful recreational access, amongst other considerations. *Id.* at 681.

Here, the Management Policies dictates that "[s]igns will be held to the minimum number, size, and wording required to serve their intended functions and to minimally intrude upon the

natural and historic settings. They will be placed where they do not interfere with park visitors' enjoyment and appreciation of park resources." NAT'L PARK SERV., MANAGEMENT POLICIES 2006, at 135. Further, "[t]he means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs . . . ." *Id.* at 105.

It is clear from the Management Policies that the decision to post or implement signage to warn individuals of potential hazards such as the alleged hole by Chang, requires the superintendent or decision-maker to consider competing policy considerations such as aesthetics, staffing and budgetary constraints, ecology, and historical importance. *See Lam*, 979 F.3d at 681. Therefore, the Court finds that the discretionary function exception also applies to Chang's alleged breach of duty for failure to warn.[3]

### 4.    *Failure to Monitor Drivers of Vehicles*

Finally, as to AMP's alleged failure to monitor drivers of vehicles operating in the public recreational areas, Chang does not allege any facts regarding vehicles on the grassy area at issue near the date of the incident (*see* Compl.); therefore, facially, this breach of duty fails. As to the Government's factual challenge of subject matter jurisdiction, this breach of duty also fails. In support of Chang's opposition, he provided photographs of parked vehicles allowed by AMP on the grassy area taken two and a half years after his fall. (ECF Nos. 31-1–31-3.) Management Policies outline policy considerations for the superintendent to consider when permitting motorized equipment in national parks. "The variety of motorized equipment—including visitor

---

[3] The Court finds that *Summers v. United States*, 905 F.2d 1212 (9th Cir. 1990), is inconsistent with the facts of this case. In *Summers*, the Ninth Circuit addressed whether a challenged government activity, or rather inactivity, under an established policy, insulated the government's decision not to post signs warning individuals of the dangers of hot fire-rings and if it fell under the discretionary function exception. *Id.* at 1217. Here, there is no established government policy but rather the balancing of completing policy considerations.

vehicles . . . —that operates in national parks could adversely impact park resources, including the park's natural landscape . . . ." NAT'L PARK SERV., MANAGEMENT POLICIES 2006, at 103. "[S]uperintendents will carefully evaluate and manage how, when, and where, motorized equipment is used by all who operate equipment in the parks . . . . Where such use is necessary and appropriate, the least impacting equipment, vehicles, and transportation systems should be used, consistent with public and employee safety." *Id.* at 104. Superintendent Alberti explained the summer event that "teaches children about indigenous culture, agriculture, marine biology, and other topics," (Alberti Decl. ¶ 6) justified allowing those vehicles to be on the grassy area.

Management Policies outline the policy considerations that the superintendent is to weigh in balancing the policy interests to preserve the grassy areas in AMP with giving public access to the park to further the park's purposes. No where is Chang able to point to a policy implemented and/or in which the Superintendent has failed to comply with. Further, Superintendent Alberti's explanation contemplates the policy considerations in Management Policies and those in which the discretionary function exception was intended to protect. Thus, this alleged breach of duty also fails on the Government's factual attack.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that the Superintendent and employees' grassy area maintenance decisions at AMP are susceptible to policy analysis. The decisions and policy tradeoffs that go into allowing public access to the grassy areas in the National Park, and/or the absence of warning signs, possible access to vehicles, undiscovered holes or ground irregularities made by visitors, maintenance crews, animals or erosion, is subject to the discretionary decisions of the Park's Superintendent and other federal employees.

Therefore, because the discretionary function exception under the FTCA bars Chang's negligence claim, this Court does not have subject matter jurisdiction. Accordingly, the Court

1  hereby GRANTS the Government's Motion and dismisses Chang's Complaint with prejudice. The

2  Clerk is directed to close this case.

3      IT IS SO ORDERED this 26th day of February 2024.

4

5                                          _____
6                                          RAMONA V. MANGLONA
                                           Chief Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28